In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3286 & 09-3468

CATHLEEN SCHANDELMEIER-BARTELS,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

CHICAGO PARK DISTRICT,

*Defendant-Appellee,*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 00922—**David H. Coar**, *Judge.*

ARGUED MAY 28, 2010—DECIDED FEBRUARY 8, 2011

Before MANION, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* While employed by the Chicago Park District, Cathleen Schandelmeier, a Caucasian, reported to her immediate supervisor that she had witnessed a possible incident of child abuse against an African-American child by his African-American aunt.

Schandelmeier's African-American supervisor exploded in a racial tirade, and Schandelmeier was fired from the Park District within hours. A jury heard this evidence and ruled in favor of Schandelmeier on her claim of race discrimination under Title VII of the Civil Rights Act of 1964, awarding her $200,000 in compensatory damages. The Park District moved for judgment as a matter of law and, alternatively, for a new trial. The district court ruled in favor of the Park District on its motion for judgment as a matter of law, finding that the supervisor's demonstrated racial bias could not have infected the Park District's termination decision, and that the jury's finding otherwise was therefore unreasonable. Schandelmeier appeals, and the Park District cross-appeals from the district court's conditional denial of its motion for a new trial.[1]

We reverse the district court's grant of the Park District's motion for judgment as a matter of law and reinstate the jury verdict for the plaintiff as to liability. We affirm in part and remand in part the district court's conditional denial of the Park District's motion for a

---

[1] Technically, the Park District's cross-appeal is unnecessary. See Advisory Committee Note to Fed. R. Civ. P. 50(c)(1) ("The party in whose favor judgment n.o.v. was entered below may, as appellee, besides seeking to uphold that judgment, also urge on the appellate court that the trial court committed error in conditionally denying the new trial. The appellee may assert this error in his brief, without taking a cross-appeal."). Although the Park District's chosen vehicle is unnecessary, it has properly presented the issues that we address on the merits.

new trial, affirming with regard to the jury instructions and the improper statements made during plaintiff's counsel's closing argument, but we remand with instructions to enter a judgment for a reduced amount of compensatory damages.

I. *The Rule 50 Motion for Judgment as a Matter of Law*

Rule 50(a) of the Federal Rules of Civil Procedure allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." The stringent standard for a judgment as a matter of law under Federal Rule of Civil Procedure 50 is the same whether the verdict under review was for the plaintiff or the defendant, and regardless of the underlying legal issues of the case. Under Rule 50, both the district court and an appellate court must construe the facts strictly in favor of the party that prevailed at trial. See *Tart v. Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004), citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000). Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence. See *Waite v. Board of Trustees of Illinois Community College Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005), citing *Reeves*, 530 U.S. at 150.

A.  *The J.J. Incident and Schandelmeier's Termination*

Schandelmeier began working for the Chicago Park District on April 23, 2006 as Cultural Coordinator for the South Shore Cultural Center. Her immediate supervisor was Andrea Adams, who worked as the facility's Center Director. Adams, in turn, reported to Alonzo Williams, who was responsible for the daily management of the Park District programs for the South Lakefront Region. Williams reported to Megan McDonald, who was Director of Lakefront Operations for the Park District. Mary Ann Rowland was human resources manager for the Lakefront region. Adams and Williams are African-American, and McDonald and Rowland are Caucasian.

Schandelmeier was responsible for supervising the Cultural Center's after-school program and its summer camp. Her job duties included creating and adhering to a program schedule, following program rotations, documenting all "incidents" involving children, and supervising children and staff. At trial, the Park District took pains to prove to the jury that Schandelmeier was far from a perfect employee. She struggled with some of the administrative tasks required in her job, and Adams documented those issues in several memos to Schandelmeier. Those memos and other examples of Schandelmeier's administrative failings were presented to the jury. But Schandelmeier did not claim to be a perfect employee, and perfection is not a requirement for protection under Title VII.

Viewing the evidence through the Rule 50 lens, in the light most favorable to Schandelmeier, the pivotal event

in her employment occurred on July 31, 2006, the day before her termination. An African-American child, "J.J.," was suspended from summer camp for misbehavior, and his aunt came to pick him up. While J.J. and his aunt were in a different room, Schandelmeier heard the sound of flesh being struck and a child screaming. She followed the sounds and saw J.J.'s aunt kneeling over him with her arm raised above her head, a belt looped in her hand. J.J. had a welt on his arm and was crying. Schandelmeier told J.J.'s aunt to stop, and the aunt left the Cultural Center with J.J. in tow.

Schandelmeier reported what she had seen and heard to Adams. Adams explained the J.J. incident as "a cultural thing," because "this is the way we discipline children in our culture." (Schandelmeier assumed, reasonably, that Adams intended to refer to African-American culture.) Adams also told her that, before Hillary Rodham Clinton wrote the book, *It Takes a Village*, "that was the philosophy that her culture had abided by." Adams then explained to Schandelmeier that she (Adams) had the "unspoken permission" of the parents of the African-American junior counselors at camp "to grab them and put them back into line."[2]

---

[2] When Adams testified at trial, she denied referring to Mrs. Clinton's book and stated that although she had asserted her ability to discipline the junior camp counselors in any way, she had made that statement on a different occasion. The jury was entitled to disbelieve Adams's testimony. On review under Rule 50, we must construe the evidence in Schandel-

(continued...)

Schandelmeier asked what she should do. Adams told her that under Illinois law, if she believed she had observed child abuse, she was obligated to report it to the Illinois Department of Children and Family Services. But, Adams said, because she had not seen what Schandelmeier saw, Adams would leave the decision to report or not to report to Schandelmeier. That night, Schandelmeier made her decision. She called DCFS and was advised that she also had to call the police within 24 hours of the incident so they could conduct a "well child check." The next morning Schandelmeier called the police and requested such a check.

At approximately 11:15 a.m. on August 1st, Adams called Schandelmeier into her office. J.J.'s aunt was in the room. Adams confronted Schandelmeier, saying, "You sent the police to this woman's house?" When Schandelmeier tried to explain, and Adams learned that Schandelmeier had not seen the aunt's belt connect with J.J.'s flesh, Adams screamed and "went ballistic." She said, "you didn't see the impact of the belt? You saw nothing!" By way of illustration, Adams told Schandelmeier that she had once tried to hit her daughter with a belt but hit the wall instead, and her daughter still screamed. She reiterated that "this is the way we discipline children in our culture," and she told Schandelmeier that it was a cultural difference that Schandelmeier did not under-

---

[2] (...continued)
meier's favor and rely on her testimony about what was said at the time of the incident.

stand. Adams then demanded, "who [was Schandelmeier] to try to tell this woman how to raise her child?" Schandelmeier responded that she had friends who were black and who did not beat their children. Adams countered, "[Y]our friends who are black tell you that they don't beat their children and then they go home and beat their children." She then ordered Schandelmeier to leave her office, saying "I can't stand the sight of you, Cathleen." Schandelmeier testified that she had never been yelled at like that in her adult life, and that Adams was "violently angry" and "spitting mad" during this exchange.

Adams then put fingers to keyboard and wrote a memo to McDonald, copying Williams. The memo was dated August 1st and its subject was "Cathleen Schandelmeier." It began with the sentence: "Per our conversation, Cathleen has no order over camp." Adams then recounted certain events to demonstrate Schandelmeier's poor performance. She accused Schandelmeier of failing to properly supervise children at camp (i.e., she was "not watching the group") and described an instance in which Schandelmeier had failed to report an emergency to Cultural Center security so they could direct first responders to the scene. Adams wrote that Schandelmeier had had to rewrite incident reports because her originals were not thorough or did not make sense, or because necessary information was either omitted or scratched out. Adams recounted that under Schandelmeier's watch, the camp's food program had received write-ups, and she accused Schandelmeier of being difficult to locate when Adams needed her.

Finally, Adams recounted the "J.J. incident," calling it "the last straw," but leaving out any reference to the racial tirade described by Schandelmeier:

> Yesterday and today was the last straw. . . . A child had several write-ups. He has been suspended and we agreed upon being expelled from camp. She called and spoke to the mother. The aunt came to pick him up. The aunt was upset about her nephew's behavior but in control. She took the child to another room and apparently gave the child a spanking. Cathleen saw the belt and heard the child crying.

> Cathleen reported to me that she saw the aunt "abusing" the child and the child had bruises on his arm. Hollee spoke with Cathleen about how some families believe in spankings. After extensive conversation with Hollee, Cathleen spoke to me. She stated that she is mandated to report abuse and that she must report it. I told her that yes, we are mandated. Since I did not see the incident, she is in a better position to know whether or not it should be reported.

> Based on my conversation with Cathleen, I trusted that being expelled was the best corrective action. As it turns out, of eight conduct reports, only half had ever been discussed with the parent. Cathleen mentioned this to me after the fact. The day was long so I suggested we review everything the next day (Tuesday).

> The aunt came in today (Tuesday) to speak with me. She stated that the police [came] to her home. They

checked out the living environment and examined the child. They found no signs of any abuse. They found a well and happy child. I asked Cathleen to sit with us and talk (she did not remember meeting the aunt the day before). Bottomline, Cathleen admitted that she did not see the aunt strike the child. Cathleen made assumptions that this child was being abused simply based on the loud screams.

It is difficult working with someone that does not follow instructions and continuously follows their own directive. The reputation of this camp is now being questioned by both parents and staff. We had a parent state that she waited for two years to get her child in and [is] disappointed at the operation of camp. Something has to give.

The same day, human resources director Rowland drafted Schandelmeier's termination letter. Williams and Adams delivered the letter at 6:00 p.m. on August 1st, ending Schandelmeier's employment immediately.

### B. *The "Cat's Paw" Theory*

To prevail on her Title VII claim, Schandelmeier had to prove that she was terminated because of her race. Specifically, she had to "provide direct or circumstantial evidence that the *decisionmaker* has acted for a pro- hibited reason. A decisionmaker is the person 'responsible for the contested decision.' " *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original), quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391,

396 (7th Cir. 1997). The evidence clearly supports the conclusion that Adams, Schandelmeier's immediate supervisor, harbored an illegal racial animus, but Adams was not the person who pulled the trigger to end Schandelmeier's employment. The person who did— either McDonald or Rowland (the evidence is inconsistent on that point)—did not harbor a racial animus against her. Schandelmeier therefore had to demonstrate some causal connection between Adams's bias and McDonald's or Rowland's decision to terminate her employment. She had to bridge that gap.

The existence of such a link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker has become known in this circuit as the "cat's paw" theory. The name is based on an old fable in which a scheming monkey convinces an unwitting cat to fetch roasting chestnuts from a fire. The cat burns its paw and the monkey gets the chestnuts.[3] In employment discrimination cases, the "cat's paw" is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias. With sufficient evidence, we permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision. Deciding the degree of influence required to permit that inference, however, is not so simple.

---

[3] "The Monkey and the Cat" by Jean de La Fontaine (1621-1695).

Recent cases from this circuit suggest that liability for an employment decision may be imputed to the employer only if a biased employee had a "singular influence" over the ultimate decisionmaker. See, *e.g.*, *Martino v. MCI Communications Services, Inc.*, 574 F.3d 447, 452-53 (7th Cir. 2009) (biased comments of non-decisionmaker relevant only if he had "singular influence" over decisionmaker); *Staub v. Proctor Hosp.*, 560 F.3d 647, 656-57 (7th Cir. 2009) (employer not liable "based on a nondecisionmaker's animus unless the 'decisionmaker' herself held that title only nominally"; evidence of illegal bias of non-decisionmakers should be excluded from trial without showing that biased employees exerted "singular influence" over decisionmaker), *cert. granted*, 130 S. Ct. 2089 (2010); *Metzger v. Illinois State Police*, 519 F.3d 677, 682 (7th Cir. 2008) (employee's retaliation claim could not survive summary judgment where employee did not come forth with evidence that biased non-decisionmaker's comments actually influenced decisionmaker, much less were the "singular influence" that cat's paw theory requires); *Brewer v. Board of Trustees of Univ. of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007) (actions of biased employee can be imputed to the employer under Title VII where biased employee without formal authority to materially alter terms and conditions of plaintiff's employment uses "singular influence" over decisionmaker by supplying misinformation or failing to supply relevant information, and plaintiff is harmed); *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 613 (7th Cir. 2005) (no evidence that police commander who was a member of the com-

mand staff that recommended to terminate plaintiff had "singular influence" over the command staff's decision); *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 730-31 (7th Cir. 2004) (affirming summary judgment for employer where the statement given by employee alleged to harbor racial animus was only one element of a comprehensive investigation into incident that was cause of plaintiff's discipline). It was under this high "singular influence" standard that the district court granted the Park District's motion for judgment as a matter of law. The court found that the decision to terminate Schandelmeier was not "controlled" by, "singularly influenced" by, or made in "blind reliance" on Adams's bias. See *Schandelmeier v. Chicago Park Dist.*, 2009 WL 2916858, at *4-5 (N.D. Ill. Sept. 9, 2009), citing *Martino*, 574 F.3d at 452-53, *Staub*, 560 F.3d at 655-59, and *Brewer*, 479 F.3d at 916-20.[4]

Other cases from this court indicate that a lesser degree of influence is sufficient to impute liability to the employer for a non-decisionmaker's bias. See, *e.g.*, *Lust v. Sealy*, 383 F.3d 580, 584-85 (7th Cir. 2004) (explaining that "cat's paw" theory of liability is not intended to be taken literally and it is enough to show that non-

---

[4] Conflicting evidence was presented at trial as to whether McDonald or Rowland made the ultimate decision to terminate Schandelmeier. There is no way to know how the jury resolved that question, although both the parties and the trial court seemed to assume that McDonald was the decisionmaker. As explained below the correct identity of the decisionmaker is not decisive either way.

decisionmaker's bias was a cause of employment decision); *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000) (summary judgment for defendant upheld where plaintiff was unable to show that perception of his poor work performance was based upon biased supervisor's input because performance was also independently noted by other supervisors); *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121-22 (7th Cir. 1998) (liability can be imputed where non-decisionmaker's bias "tainted the decision maker's judgment"); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997) ("the prejudices of an employee, normally a subordinate but here a coequal, are imputed to the employee who has formal authority over the plaintiff's job . . . where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision"); *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir. 1997) (judgment for defendant as a matter of law affirmed where plaintiff did not present evidence that the biased employees were "able to manipulate the decisionmaking process and to influence the decision"); *Shager v. Upjohn Co.*, 913 F.2d 398, 404-05 (7th Cir. 1990) (if review committee unaware of manager's age-based animus acted "as the conduit of [manager's] prejudice— his cat's paw—the innocence of its members would not spare the company from liability").

The statutory language of Title VII and the standard jury instructions in this circuit weigh against too stringent a standard of proof for the cat's paw theory. Title VII is

written in terms of what the employer is prohibited from doing: it is unlawful "for an employer—(1) to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The focus is on the employer entity as a whole, not on individual managers or supervisors, who are not individually liable for an employer's violations of federal discrimination statutes. See, *e.g., Williams v. Banning*, 72 F.3d 552, 553-54 (7th Cir. 1995). The statute is also written broadly in terms of cause: "because of such individual's race." This circuit's pattern jury instructions in employment discrimination cases focus on causation. They leave plenty of room for counsel to argue a "cat's paw" theory as a question of fact. The district judge gave the appropriate standard instruction here: "To determine that Ms. Schandelmeier-Bartels was terminated because of her race, you must decide that the Park District would not have terminated Ms. Schandelmeier-Bartels had she been non-Caucasian but everything else about Ms. Schandelmeier-Bartels had been the same." See Seventh Circuit Pattern Civil Jury Instructions No. 3.01; see also *Achor v. Riverside Golf Club*, 117 F.3d 339, 340-41 (7th Cir. 1997); *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994). It is not necessary to instruct the jury about the intricacies of various doctrines the courts have developed for digesting summary judgment motions in employment discrimination cases. The court may and should simply ask the jury the counter-factual question, and the parties may argue whether, for example, the plaintiff's race made the critical difference, regardless of which of the employer's

agents made or influenced the decision, or exactly how they did so.

## C.  *Applying the Cat's Paw Theory*

The Supreme Court has not yet resolved the circumstances under which an employer may be held liable based on the discriminatory intent of employees who influence but do not actually make the ultimate employment decision. See *Ricci v. DeStefano*, ___ U.S. ___, 129 S. Ct. 2658, 2688-89 (2009) (Alito, J. concurring). However, the Court has granted certiorari and heard argument in *Staub*, see 130 S. Ct. 2089 (2010), and may soon offer guidance on the issue. In the meantime, we need not decide in this case whether the influence must be "singular" or whether a less demanding causation standard is sufficient. Here, interpreting the conflicting evidence in favor of the plaintiff, the jury could reasonably conclude that when the decision was made to fire Schandelmeier, only Adams's biased voice mattered. Whether it was McDonald or Rowland who made the nominal decision to fire Schandelmeier, there was sufficient evidence at trial from which the jury could have concluded that Adams had the decisive input in the decision. The jury could conclude that any "investigation" conducted by McDonald or Rowland was irrelevant because Adams was the sole source of nearly all the pertinent information. Because a reasonable jury could have found that Adams's influence over the termination decision was singular, we must reverse the grant of judgment as a matter of law.

1. *McDonald as Decisionmaker*

McDonald, who was three supervisory levels removed from Schandelmeier, testified that she had very little contact with Schandelmeier during her employment. She did not personally observe Schandelmeier's job performance, and McDonald's office was located off-site. In evaluating Schandelmeier's performance, she relied entirely on information from others, including their oral descriptions of Schandelmeier's performance and documents such as samples of her improperly completed incident reports.

According to the employer's version of events, about a week before the J.J. incident, McDonald, Rowland, Williams and Adams met in McDonald's office to discuss Schandelmeier's possible termination. No formal decision was made in that discussion, although McDonald testified that Adams "certainly" had input, and that the decision ultimately was a "joint" decision. Even though it was a "joint" decision and the group did not reach a consensus, McDonald testified, she had decided by July 24th that Schandelmeier should be terminated. On that day, McDonald sent the following e-mail to Rowland under the subject line "CAM request," short for "Corrective Action Meeting request":

> Cathleen Schandelmeier has had several ongoing problems at South Shore in the past few weeks that are pretty serious. Andrea [Adams] and Alonzo [Williams] have both had several conversations with her about the various issues. Things are not working out with her—and I know she is still within her probationary period. Andrea has already put together a

memo regarding the issues and struggles, and I believe that you also have a copy.

Because she is non union, and because she is still within her probationary period—do we have to even schedule a CAM, or can we release her from her duties?

If we need to schedule a CAM, please do that as soon as possible. If we don't—can you please check with Beka and confirm that we are able to release her?

No responsive e-mail from Rowland was introduced into evidence. McDonald also testified that she informed both Williams and Adams of her decision to terminate Schandelmeier sometime between July 24th and August 1st.

If McDonald really was the decisionmaker, and if her decision was already made on July 24th, it would be more difficult to conclude that Adams's exhibition of racism on July 31st tainted McDonald's already-made decision to fire Schandelmeier. The most basic problem for the Park District is that the evidence does not point consistently in that direction. McDonald herself described the decision as a "joint" one (and one in which Adams "certainly" had input), but the supervisory group had not reached a "joint" decision about Schandelmeier's employment as of July 24th. Both Williams and Adams testified that they had no idea that Schandelmeier would be terminated until she was actually terminated on August 1st. If McDonald had actually reached a decision before then—especially the "joint" decision she described in her testimony—the jury

could reasonably infer that she would have informed Schandelmeier's direct supervisors—Williams and Adams, who supposedly participated in the "joint" decision—of her decision. Also, the language McDonald used in her "CAM request" e-mail is not absolute and does not state that any decision—hers or anyone else's—had been made. The jury could have reasonably read McDonald's message as only a request for information in case a decision was made to terminate Schandelmeier. The jury had reasonable grounds for discounting McDonald's testimony that her mind was made up on July 24th and that her mind was the only one that counted.

The Park District also attempted to show that McDonald did not know about the J.J. incident until after Schandelmeier's termination. McDonald testified that she had no knowledge of the J.J. incident until after August 1st, and Adams testified that she did not discuss the J.J. incident with anyone on July 31st. But the jury also had Adams's "last straw memo," drafted on August 1st and addressed to McDonald, which began with the words "per our conversation." Here again, the jury had sufficient evidence from which it could have concluded that, contrary to her testimony, McDonald knew about the J.J. incident before she decided to fire Schandelmeier, and that Adams had decisive influence over that decision.

### 2. *Rowland as Decisionmaker*

During her deposition, Rowland testified that she fired Schandelmeier, that no one else fired Schandel-

meier, and that no one else recommended to her that Schandelmeier be fired. At trial, however, Rowland testified that McDonald had recommended that Schandelmeier be fired, although Rowland did not know what information McDonald considered or why she recommended termination. Rowland also testified at trial that she fired Schandelmeier because, two or three weeks before August 1st, she had witnessed Schandelmeier not interacting with day-campers. She testified that Schandelmeier had failed to prepare camp schedules and that parents were complaining. When pressed, though, Rowland admitted that no parent had actually spoken to her or complained about the availability of camp schedules. Nevertheless, Rowland claimed she drafted Schandelmeier's termination letter on August 1st as soon as she arrived in the office because "this was an important thing that needed to get done that morning, so that was the first thing that I did when I got into my office." As in McDonald's version, Rowland testified that she acted without knowledge of the J.J. incident or Adams's "last straw" memo.

But Rowland also was confronted by—and the jury heard—her earlier deposition testimony in which she stated that she discussed the J.J. incident with Williams on the morning of August 1st. Also, Adams testified that she was certain that she had called and spoken to Rowland on July 31st. The jury was not obligated to believe Rowland's explanation for why she decided to fire Schandelmeier, or even that she was the decision-maker at all, let alone that the timing was innocently coincidental. To the contrary, given all of the conflicts

in the evidence, including the conflicts between the different defense witnesses' testimony, the jury heard sufficient evidence to have concluded that it was more likely than not that Rowland knew of the J.J. incident when she drafted the termination letter, and that Adams had a decisive influence on the termination decision.

Regardless of whether McDonald or Rowland was the actual decisionmaker, the parties' briefs have focused on pinpointing the details of who, what, and when about the J.J. incident, as though all discriminatory bias in this case stems from that one event. The jury, however, was not required to see it that way. The J.J. incident provided strong evidence of Adams's racial bias, but the jury was not required to assume that Adams's bias affected her only at that specific time with respect to that single incident. Nor was the jury required to assume that the termination decision could have been tainted by Adams's influence—singular or not—only if the decision could be connected to that one incident. Under the cat's paw theory, the appropriate inquiry is whether the biased Adams had influence over the decision to terminate Schandelmeier, and, if so, how much influence she had, without limiting the inquiry to the single incident where that bias was displayed so flagrantly.

### 3.  *Lack of an Independent Investigation*

Under any formulation of the cat's paw standard, the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent

investigation of the information being supplied by the biased employee. See, *e.g.*, *Martino*, 574 F.3d at 453 (decisionmaker's independent investigation defeated effort to rely on cat's paw theory); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547-48 (7th Cir. 1997) (same). Here, however, Schandelmeier presented ample evidence from which the jury could have concluded that, whether the decisionmaker was McDonald or Rowland, the Park District's "investigation" into Schandelmeier's job performance was not independent of Adams's input. The jury could find that, in fact, the supposed investigation was based almost entirely on Adams's input.

McDonald testified that she did not personally observe Schandelmeier's performance and that she relied entirely on information she got from other people. She never saw the food service write-ups.[5] Prior to drafting her July 24th "CAM request" e-mail, she discussed Schandelmeier's performance with Adams, Williams, and Rowland, and her e-mail referred to Adams's memo. This was the full extent of McDonald's "investigation." Williams testified that he observed some issues with Schandelmeier's employment, but neither he nor McDonald testified as to what Williams may or may not have conveyed about Schandelmeier's performance to McDonald. His testimony was specific, however, that he never

---

[5] McDonald testified that she spoke with the chief administrator of food services in early July about problems with food service at the lakefront parks. There was no testimony that this discussion focused specifically on Schandelmeier's performance.

recommended that Schandelmeier be fired. Adams, on the other hand, papered Schandelmeier's file with performance-related memos, in particular the August 1st "last straw" memo. McDonald did not attempt to observe Schandelmeier's work performance herself, nor did she attempt to speak to Schandelmeier about her performance issues. The jury could easily conclude from this evidence that the only meaningful information McDonald acquired in her "investigation" came from Adams, the racially biased source.

Even if the jury concluded that Rowland was the decisionmaker instead of McDonald, that additional layer of supervision did not improve the quality of the investigation into Schandelmeier's job performance. Rowland's "investigation" was even less thorough and independent than McDonald's. She testified at trial that her termination decision was based on input she received from McDonald—whose own opinion, as noted, was based almost entirely on information garnered from Adams. Rowland testified, too, that two or three weeks before Schandelmeier's termination, she had witnessed Schandelmeier not interacting with day-campers, and that parents were complaining because Schandelmeier had not prepared a schedule for camp. Rowland was the human resources manager, however, and the jury was entitled to find that her statements regarding Schandelmeier's performance were not entirely credible, particularly after she admitted that no parents actually complained to her about the missing camp schedules. Rowland did not testify that she sought additional input from Williams, Schandelmeier

herself, or even Adams. This evidence, again, does not diminish the pervasive influence of Adams and her bias. Keeping in mind the Rule 50 standard, we find sufficient evidence in the record to support the conclusion that the decisive influence on the decision was Adams's bias, regardless of whether McDonald or Rowland was the formal decisionmaker.

By way of illustration, compare this evidence to the lack of similar evidence in *Willis v. Marion County Auditor's Office,* in which judgment as a matter of law in favor of an employer was affirmed. *Willis* was a retaliatory discharge case. No evidence was presented from which the jury could have concluded that the decisionmaker harbored an impermissible racial or retaliatory bias against the plaintiff. *Willis*, 118 F.3d at 546. But evidence was presented to suggest that two non-decisionmakers did. Despite a jury verdict for the plaintiff, judgment as a matter of law for the defense was upheld because it was shown that, rather than accepting the biased supervisors' word regarding the plaintiff's performance problems, the actual decisionmaker permitted the plaintiff to explain her deficiencies, which she was unable to do. The decisionmaker also aired the plaintiff's suspicions that she was being targeted for impermissible reasons and permitted the plaintiff to try (unsuccessfully) to substantiate her claim. Also, the decisionmaker's termination decision was based ultimately on the plaintiff's undisputed violations of objective performance standards. See *id*. at 547-48. Because of these factors, we agreed with the district court that the causal chain had been broken in *Willis* as a matter of law.

Similar factors are not present here, at least beyond reasonable factual dispute, so the jury could find that the causal chain remained intact. Schandelmeier's race discrimination case survived summary judgment because the district court found that disputed issues of material fact existed as to whether the decision to terminate Schandelmeier was made before or after Adams sent the August 1st "last straw" memo, among other things. The court found that if that fact were resolved in Schandelmeier's favor at trial, "a jury could believe that Adams objected to Plaintiff in her employment capacity because of her race and perceived inability to understand allegedly African-American social mores, leading her to write the August 1 memorandum that may have caused Plaintiff to be fired later that same day," and that even if McDonald were the sole decisionmaker, Adams's "prejudices could be imputed to McDonald if it can be shown that Adams concealed relevant information from McDonald or fed false information to her in order to influence her decision." See *Schandelmeier-Bartels v. Chicago Park Dist.*, 2008 WL 4855649, at *6, n.3 (N.D. Ill. Nov. 7, 2008), citing *Lust*, 383 F.3d at 585. We agree with that analysis. If that evidence had not materialized at trial, and if Schandelmeier had not introduced other evidence in its place, this court would be obligated to affirm the grant of the Park District's Rule 50 motion. See *Filipovich v. K&R Express Systems, Inc.*, 391 F.3d 859, 863 (7th Cir. 2004). However, Schandelmeier offered sufficient evidence at trial to connect Adams's racial bias to the Park District's decision to terminate her employment. The district court's entry of

judgment as a matter of law in favor of the Park District is reversed, and the jury's finding of liability is reinstated.

II. *The Rule 59 Motion for a New Trial*

When the Park District filed its motion for judgment as a matter of law, it also moved for a new trial on three separate grounds. The district court conditionally denied that motion, and the Park District argues that the denial was erroneous. We review the denial of a motion for a new trial for abuse of discretion. See *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). The issue is not how the reviewing court would have ruled in the first instance but whether the district court's judgment was a reasonable one under the circumstances. See *EEOC v. Century Broadcasting Corp.*, 957 F.2d 1446, 1460 (7th Cir. 1992). The district court is in the best position to evaluate the effects of arguable confusion in jury instructions and prejudicial comments during closing arguments, and we defer to its sound discretion. *E.g.*, *Mayall v. Peabody Coal Co.*, 7 F.3d 570, 572 (7th Cir. 1993) (affirming denial of new trial).

We consider the three issues raised by the Park District in the following order. First, we examine the court's rejection of the Park District's proposal to advise the jury during deliberations to omit the reference to August 1, 2006 in Jury Instruction 17; second, we consider plaintiff's counsel's insinuation in closing argument that the Park District fabricated the July 24th e-mail; and third, we address the jury's $200,000 compensatory damage award.

A. *Jury Instructions*

During deliberations, the jury sent a note asking the court to clarify an apparent inconsistency between Jury Instruction 17 and the verdict form. Jury Instruction 17 read:

> Ms. Schandelmeier-Bartels claims that on August 1, 2006, she was terminated from her position as Cultural Program Director for the South Shore Cultural Center because of her race.
>
> To succeed on this claim against the Chicago Park District, Ms. Schandelmeier-Bartels must prove by a preponderance of the evidence that she was terminated by the Park District because of her race.
>
> To determine that Ms. Schandelmeier-Bartels was terminated because of her race, you must decide that the Park District would not have terminated Ms. Schandelmeier-Bartels had she been non-Caucasian but everything else about Ms. Schandelmeier-Bartels had been the same.
>
> If you find that Ms. Schandelmeier-Bartels has proved this by a preponderance of the evidence, then you must find for Ms. Schandelmeier-Bartels. However, if you find that Ms. Schandelmeier-Bartels did not prove this by a preponderance of the evidence, then you must find for the Park District.

The verdict form, in contrast, asked only "Did Plaintiff Cathleen Schandelmeier-Bartels prove by a preponderance of the evidence that she was terminated by the Chicago Park District because of her race?" without referring to a particular date.

The jury's note referred to this difference and asked, "are we considering the *date* as a factor of the termination (per jury instruction) or are we taking into consideration the entire span of Miss Schandelmeier's employment per written complaint?" (Emphasis in original.) The Park District asked the court to respond by deleting the reference to August 1, 2006 from Jury Instruction 17, arguing that its proposal would correct the arguable discrepancy between Jury Instruction 8's mandate to "consider all of the evidence bearing on the question" and the jury's question about the importance of the date of August 1, 2006. The court rejected the Park District's proposal and directed the jury to follow the instructions as initially given.

The Park District describes the prefatory language in Jury Instruction 17 referring to Schandelmeier's termination date as a "latent ambiguity that confused and misled the jury to focus exclusively on that date." Def. Br. 53. Because of that ambiguity, the Park District argues, the jury "likely ignored evidence of incidents occurring on or before August 1, 2006," such as the earlier documentation of Schandelmeier's poor performance. In support, the Park District points only to the question submitted by the jury during the deliberations. It argues that the court's instruction that the jury "consider all the evidence" in response to the jury's question was insufficient to cure the jury's supposed confusion.

Federal Rule of Civil Procedure 51(b)(2) requires the court to offer the parties an opportunity to object to instructions before the instructions and arguments are

delivered, and Federal Rule of Civil Procedure 51(c)(2) specifies that an objection to an instruction is timely if the objection is delivered within the time frame provided by Rule 51(b)(2), i.e., before instructions and arguments are delivered. Here, the Park District did not object until the jury was in the middle of its deliberations, so its objection was not timely.

We have discretion to review instructions for plain error under Rule 51(d)(2), but there was no plain error here. Jury Instruction 17 provided August 1st as the date that Schandelmeier was terminated, a correct statement of the facts of this case. The instruction did not require the jury to limit its review of the evidence to that date. Instead, Jury Instruction 8 explicitly directed the jury to consider *all* of the evidence in the case. We assume that the jury followed the instructions as they were provided. See *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007). Here, whatever confusion might have remained after the court's clarification was cured sufficiently by Jury Instruction 8, which told the jury to "consider all of the evidence bearing on the question [of whether any fact has been proved] regardless of who produced it." The Park District only speculates that the jury remained confused after the court responded to its inquiry, but its speculation is not sufficient to support its motion for a new trial. The district court's denial of the Park District's motion for a new trial on this ground is affirmed.

B. *Remarks in Closing Argument*

In his closing argument, counsel for the plaintiff challenged the authenticity of McDonald's July 24th "CAM request" e-mail. He stated:

> Plaintiff's Counsel: I would suggest to you that they put that e-mail up there that supposedly got written by Rowland.[6] And I would suggest to you that you should think about, not conclude but think about the possibility that that document didn't get created till after Cathleen Schandelmeier got fired.
>
> Defense Counsel: Objection, your honor.
>
> Court: Overruled.
>
> Plaintiff's Counsel: And I'll tell you why you should think about it this way. Because it's contradicted by this document. It just doesn't make any sense that the last straw about discharge is out there as we've got to like discharge her and fire her and turn right over this other document two weeks earlier or a week earlier saying we've already decided to fire her. They can't have it both ways. And the other document, let's face reality. Even if it is a legit document, which I strongly suggest to you that it's not, they didn't do anything about it.

The July 24th e-mail was produced to Schandelmeier during discovery. She did not seek the electronically-

---

[6] The argument mistakenly attributed McDonald's e-mail to Mary Ann Rowland.

stored version of the e-mail. She did not object to the authenticity of the e-mail during the pretrial conference or at any other stage in the litigation. At trial, the e-mail was introduced to the jury as a joint exhibit.

The Park District argues that plaintiff's counsel "crossed the line from zealous advocacy to prejudicial error" by suggesting to the jury that McDonald's July 24th e-mail was created after Schandelmeier was fired. Schandelmeier concedes that she had no evidence to support her counsel's insinuation. She consented to the admission of the e-mail as a joint exhibit, and she did not present any evidence to refute McDonald's testimony that she created and sent the e-mail on July 24, 2006. Instead, she contends that her counsel was free to question the legitimacy of the e-mail, even though it was admitted as a joint exhibit, so long as the argument presented was based on evidence admitted at trial. Pl. Reply Br. 36, citing *Jones v. Lincoln Electric Co.*, 188 F.3d 709, 731 (7th Cir. 1999). Because the parties presented conflicting time-lines of the decision-making process, Schandelmeier argues, her counsel's closing argument was "well within the bounds."

Was counsel's suggestion that the July 24th e-mail had been fabricated proper? No. Should the Park District's objection been sustained? Yes. Although different witnesses told different versions of the decisionmaking process, none of the witnesses even hinted that the July 24th e-mail had been fabricated. No evidence put before the jury supported that inference. A suggestion that an opposing party—and, by extension, its coun-

sel—has put forth falsified evidence is very different from (and much more serious than) a contention that one witness's version of events has a better factual foundation and thus is more likely to be true than another witness's version of the same events, or that one document is inconsistent with another. Contrary to Schandelmeier's description of her counsel's argument, what the jury heard in closing argument was not "founded upon and justified by inconsistent testimony presented by the Park District in connection with the alleged creation and intent of that e-mail." Pl. Reply Br. 39. It was a baseless argument created from whole cloth by plaintiff's counsel, regarding an exhibit that plaintiff had stipulated was authentic and admissible. The argument was improper, and the Park District's objection should have been sustained.

But the inappropriate suggestion that the e-mail was fabricated did not rise to a level of error that made it an abuse of discretion to deny the motion for a new trial. We have stated repeatedly that improper comments during closing argument rarely amount to reversible error. *E.g.*, *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008), citing *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997). We presume that curative instructions to the jury mitigate harm that may otherwise result from improper comments during sometimes heated closing argument. See *Soltys*, 520 F.3d at 744, citing *Jones*, 188 F.3d at 732. Here, the jury was instructed that closing arguments by counsel were not evidence: "The lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the

evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts." Again, we presume that juries follow the instructions they are given. See *Chlopek*, 499 F.3d at 702. There is no indication that this jury was unwilling or unable to follow the court's instruction not to treat closing argument as evidence. Although plaintiff's counsel's commentary regarding the July 24th e-mail was improper, it was not so unfairly prejudicial as to require a new trial.

C. *The Compensatory Damage Award*

Finally, we address the Park District's motion for a new trial on the issue of the amount of the jury's compensatory damages award. The Park District contends that the jury's award of $200,000 in compensatory damages was not reasonably related to any injury that Schandelmeier suffered, so that either the award should be reduced or the case should be remanded for a new trial on damages. Evaluating issues as subjective and elusive as emotional damages is a task we leave in the first instance to the common sense and collective judgment of juries. We defer to their judgment unless the award is "monstrously excessive" or unless "there is no rational connection between the award and the evidence," and we also consider whether the award is comparable to those in similar cases. *Marion County Coroner's Office v. Equal Employment Opportunity Comm'n*, 612 F.3d 924, 930-31 (7th Cir. 2010); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th Cir. 2006); *Deloughery v. City of Chicago*, 422 F.3d 611, 619 (7th Cir. 2005). It may be that the "mon-

strously excessive" inquiry will be too vague to be of much use and is simply a different way of asking whether there is a rational connection between the award and the evidence. See *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004). However the test is phrased, we begin our examination there.

In defense of the jury's award, Schandelmeier argues that the jury had ample opportunity to view and assess her demeanor and emotional state during the seven hours she spent on the witness stand. The jury heard her describe how Adams screamed at her in front of J.J.'s aunt and reprimanded her for being ignorant of African-American culture—a culture that Adams apparently believed was accepting of child abuse. Schandelmeier testified that she had "never been yelled at like that in [her] adult life," and the things Adams said were "profoundly disturbing" because Schandelmeier had "work[ed] in the field of racial justice" and "never dreamt that [she would] be in an environment where [she] would be so prejudiced against." Upon being terminated, Schandelmeier felt "disturbed," "devastated" and "upset" because she could not support her family. She also testified that witnessing the J.J. incident was a haunting experience, and that "it changed the course of my life and the life of those I love." She wished that she could have done more to protect J.J. because she was a "big advocate in the prevention of child abuse."

Although there is a rational connection between this evidence and a substantial amount of compensatory damages, it does not approach the level required to

uphold an award of $200,000. The award is excessive and must be reduced substantially. Although the jury could have concluded that the J.J. incident triggered Adams's race-based tirade and brought to the surface a latent racial animus in the Park District that led to Schandelmeier's termination, the J.J. incident, in and of itself, was not an adverse employment action and was not actionable under Title VII. The jury could not hold the Park District liable for any emotional injury Schandelmeier might have suffered as a result of witnessing J.J.'s aunt strike him. Thus, we cannot find support for the award in Schandelmeier's testimony that she has been "haunted" or that the course of her life was changed because she witnessed the J.J. incident.

We do consider Schandelmeier's testimony concerning the emotional impact of the discriminatory acts that were directed at her, including Adams's racist tirade and her termination. Although Adams's rants on July 31st and August 1st were understandably offensive and disturbing to Schandelmeier, those incidents were also isolated. She was not subjected to such incidents throughout her employment with the Park District, but only twice, and she did not testify to any lasting physical or emotional effects resulting from Adams's abuse. Regarding her termination, she testified that she was "disturbed," "devastated" and "upset" to be losing her job, but she also testified that she found a new job just 10 days later. Schandelmeier did not testify to any lasting emotional or physical ill-effects from losing her job with the Park District.

Schandelmeier cites several cases in which large compensatory damage awards were upheld on appeal. Her list includes *Farfaras v. Citizens Bank & Trust*, 433 F.3d 558, 563, 566-67 (7th Cir. 2006) (upholding a compensatory damage award of $200,000 where employee suffered repeated physical and verbal sexual harassment and testified to ongoing physical and emotional issues, including lost self-esteem, weight gain, sleeping problems, and nervousness); *Bogle v. McClure*, 332 F.3d 1347, 1358-59 (11th Cir. 2003) (compensatory damage award of $500,000 for each of seven plaintiffs in race discrimination case upheld where plaintiffs testified that race-based transfers destroyed their careers, upset, embarrassed, humiliated, and shamed them, and some plaintiffs became depressed); *Lilley v. BTM Corp.*, 958 F.2d 746, 754 (6th Cir. 1992) (upholding $350,000 for mental anguish resulting from retaliatory discharge under Michigan law where employee testified to resulting feelings of anguish and embarrassment, weight loss, difficulty sleeping, and marital troubles); *Moody v. Pepsi-Cola Metro. Bottling Co.*, 915 F.2d 201, 210 (6th Cir. 1990) (upholding $150,000 award for emotional distress in age discrimination case where plaintiff had ongoing depression and marital troubles as a result). These cases are helpful even though they are not controlling. See *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir. 2003) ("Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive."). The higher damage awards affirmed in these cases were supported with first- and third-person testimony regarding ongoing emotional and physical effects of the discrimination suffered

by the plaintiffs. No such evidence supported the jury's award here.

Other cases from this circuit in which plaintiffs were found to have suffered discriminatory workplace incidents and discharge are more instructive than those cited by Schandelmeier for finding a reasonable range for an award in this case. See, *e.g.*, *Marion County Coroner's Office*, 612 F.3d at 930-31 (distinguishing *Farfaras* and reducing $200,000 award to $20,000 based on plaintiff's brief testimony that he had undergone weekly therapy sessions for several months to treat depression); *Pickett v. Sheridan Health Care Center*, 610 F.3d 434, 446 (7th Cir. 2010) (upholding compensatory damage award of $15,000 where plaintiff testified that she was very upset by how she was treated, felt embarrassed, and nearly became homeless as a result of discriminatory discharge); *Lust*, 383 F.3d at 589 (finding that district court did not err in reducing jury's compensatory damage award from $100,000 to $27,000, and award was not excessive where plaintiff testified to "nontrivial symptoms of anxiety and other forms of emotional distress" due to belated promotion); *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003) (upholding district court's reduction of compensatory damage award from $100,000 to $50,000 based on plaintiff's testimony that she became depressed, angry, and humiliated following co-worker's retaliatory promotion and suffered from stomachaches and difficulty sleeping); *Tullis v. Townley Engineering & Mfg. Co.*, 243 F.3d 1058, 1067-68 (7th Cir. 2001) (upholding $80,000 in damages for emotional distress where plaintiff felt "degraded" and "backstabbed" by employer).

Under ordinary circumstances, we could remand this question to the district court for further consideration. As the Supreme Court has explained, "Trial judges have the unique opportunity to consider the evidence in the living courtroom context, while appellate judges see only the cold paper record." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 438 (1996) (internal quotations omitted). In this case, however, Judge Coar, the able district judge who presided over the trial, has retired from the judiciary. A remand would go to a different judge who would not have the benefit of having presided over the trial. We are now situated at least as well as a newly-assigned district judge would be to make this decision.

We do not pretend that this is a scientific or precise calculation, and we owe the jury's determination substantial deference. See, *e.g.*, *Morales v. Cadena*, 825 F.2d 1095, 1100 (7th Cir. 1987) (affirming emotional damages award of $82,000). In the absence of stronger evidence of long-lasting emotional harm to plaintiff, and even giving due deference to the jury's determination, we find that an award higher than $30,000 on this record would be unreasonable. Upon remand, the district court shall enter judgment in favor of plaintiff for $30,000.

III. *Conclusion*

We reverse the district court's grant of the Park District's motion for judgment as a matter of law and reinstate the jury verdict on liability in favor of Schandelmeier. We affirm the district court's denial of

the Park District's motion for a new trial on the grounds of the jury instructions and plaintiff's counsel's improper comments during closing argument, but remand with instructions to enter judgment in favor of plaintiff for $30,000. On remand, plaintiff may seek a reasonable attorney fee and costs.

REVERSED IN PART,
AFFIRMED IN PART, AND REMANDED.