In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2075

ISABELLE BLASDEL,

*Plaintiff-Appellant*,

*v.*

NORTHWESTERN UNIVERSITY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 5576—**Charles P. Kocoras**, *Judge*.

ARGUED JUNE 5, 2012—DECIDED JULY 19, 2012

Before BAUER, POSNER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*.  This is a Title VII suit for employ-ment discrimination on grounds of the employee's sex. After dismissing as untimely the first count of a two-count complaint, the district judge granted summary judgment in favor of the defendant on the second count and so dismissed the entire suit, precipitating this appeal.

The first count had alleged a series of discriminatory acts beginning when the plaintiff was hired in 2003 by Northwestern University, the defendant, and ending with the termination of her employment in 2008. The second count was confined to her denial of tenure in 2007 and the ensuing termination, which the parties treat as the inevitable consequence of the denial of tenure. The judge dismissed the first count on the ground that liability for all but the acts charged in the second count was time-barred. 2009 WL 5166218 (N.D. Ill. Dec. 23, 2009). For only the denial of tenure occurred within the 300-day window for filing a charge of discrimination, 42 U.S.C. § 2000e-5(e), though if she proved that the denial of tenure was unlawful this would void the termination as well, assuming as we do that it was the automatic consequence of the denial of tenure. We think the judge's dismissal of the first count was correct for the reasons he gave, and do not think it necessary to add our two cents' worth to his analysis. All we'll decide is whether the plaintiff is entitled to a trial on her claim that she was denied tenure because she is a woman.

*University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990), in rejecting a claim that materials submitted for consideration in a tenure determination should be subject to a privilege grounded either in federal common law or in the free-speech clause of the First Amendment, held Title VII fully applicable to such determinations. The Court explained that the elimination in 1972 of an exemption in the original Act for employment decisions by educational institutions had "expose[d] tenure determinations to the same enforcement procedures applicable to other employment decisions." *Id*. at 190.

But although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist, practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level. *Vanasco v. National-Louis University*, 137 F.3d 962, 968 (7th Cir. 1998) ("such decisions necessarily rely on subjective judgments about academic potential"); *Namenwirth v. Board of Regents of University of Wisconsin System*, 769 F.2d 1235, 1243 (7th Cir. 1985) ("tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments"); *Fisher v. Vassar College*, 70 F.3d 1420, 1435 (2d Cir. 1995) ("it is difficult to conceive of tenure standards that would be objective and quantifiable"), abrogated on other grounds, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48 (2000); *Zahorik v. Cornell University*, 729 F.2d 85, 92-93 (2d Cir. 1984) ("the particular needs of the department for specialties, the number of tenure positions available, and the desired mix of well known scholars and up-and-coming faculty all must be taken into account . . . . [T]enure decisions are a source of unusually great disagreement . . . . [T]he stakes are high, the number of relevant variables is great and there is no common unit of measure by which to judge scholarship").

And we must not ignore the interest of colleges and universities in institutional autonomy. *Grutter v. Bollinger*, 539 U.S. 306, 328-30 (2003); *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *Hosty v. Carter*,

412 F.3d 731, 736 (7th Cir. 2005) (en banc) ("academic freedom includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government, including the courts"); *Piarowski v. Illinois Community College District 515*, 759 F.2d 625, 629-30 (7th Cir. 1985); *Urofsky v. Gilmore*, 216 F.3d 401, 412-15 (4th Cir. 2000) (en banc). Although the Supreme Court in *University of Pennsylvania v. EEOC*, *supra*, 493 U.S. at 195-201, was emphatic that academic freedom does not justify immunizing materials submitted in the tenure process from the EEOC's subpoena power, courts tread cautiously when asked to intervene in the tenure determination itself. They must be mindful that, as Judge Friendly said in *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980), "to infer discrimination from a comparison among candidates is to risk a serious infringement of first amendment values. A university's prerogative 'to determine for itself on academic grounds who may teach' is an important part of our long tradition of academic freedom. *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., joined by Harlan, J., concurring in the result) (citations omitted)."

A disappointed candidate for tenure at a college or university may well be the best possible candidate along one dimension but not others. If *A* publishes an excellent academic paper every five years on average, is she better or worse than *B*, who publishes a good but not excellent paper on average every six months, so that at the end of five years he has published 10 papers and she only 1? Quantity and quality are (within limits) substitutes. A

company that made the finest automobile in the world, but made only one a year, would not be the world's best automobile manufacturer. Or suppose Professor *C* used to publish a paper every six months, but she has slowed down, while *D*, who is younger, has not. That is an ominous sign from the standpoint of granting *C* tenure, because a tenured professor is very hard to fire even if he or she has ceased to be a productive scholar. With mandatory retirement now unlawful, the grant of tenure is often literally a lifetime commitment by the employing institution, barring dementia or serious misconduct.

In some academic fields, moreover—including as it happens physiology—research requires costly laboratories financed by grants from the federal government or from foundations. Proficiency in obtaining grants is a highly valued capability in such fields; and scholars differ in their ability to obtain grants. Then too, office politics frequently plays a role in the award or denial of tenure; friendships and enmities, envy and rivalry—the stuff of such academic novels as *Publish and Perish: Three Tales of Tenure and Terror*, by James Hynes, or Randall Jarrell's *Pictures from an Institution*—can figure in tenure recommendations by the candidate's colleagues, along with disagreements on what are the most promising areas of research. In addition, many academics are hypersensitive to criticism, especially by younger academics, whom they suspect, often rightly, of wanting to supplant them. Although office politics and professional jealousy are bad reasons for denying tenure, an erroneous denial of tenure, as such, does not violate Title VII.

*Namenwirth v. Board of Regents of University of Wisconsin System*, *supra*, 769 F.2d at 1242; *Lieberman v. Gant*, *supra*, 630 F.2d at 67-68; cf. *Anderson v. University of Wisconsin*, 841 F.2d 737, 741-42 (7th Cir. 1988).

The decisionmaking process in an academic hierarchy creates further complication. Granting tenure, like appointing a federal judge, is a big commitment. The final decision may be made by a committee, or an official such as a university provost or president, remote from the chairman and the other members of a candidate's department. Even if invidious considerations play a role in the department's recommendation for or against tenure, they may play no role in the actual tenure decision, made at a higher level. In the present case the tenure decision was made by Northwestern's provost, and there is no evidence that he was influenced by the fact that Blasdel is a woman. So she can prevail only by showing that the provost's decision was decisively influenced by someone who *was* prejudiced. *Sun v. Board of Trustees of University of Illinois*, 473 F.3d 799, 812-13 (7th Cir. 2007); *Qamhiyah v. Iowa State University of Science & Technology*, 566 F.3d 733, 745-46 (8th Cir. 2009); cf. *Schandelmeier-Bartels v. Chicago Park District*, 634 F.3d 372, 378-79, 383-84 (7th Cir. 2011); *Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 667 (7th Cir. 2007).

And finally, because so many factors influence the tenure process and because statistical inferences of discrimination are difficult to draw when there is only a small number of observations (tenure appointments in a

particular department may be few and far between), it can be difficult to infer the presence of an invidious influence such as the sex of the candidate merely by comparing successful and unsuccessful tenure applicants.

Isabelle Blasdel was hired by Northwestern's medical school to be an assistant professor in the physiology department beginning in 2003. She is an electro-physiologist—that is, she studies the electrical activity of the brain. She was 42 years old when hired by Northwestern and before that had worked for eight years as a non-tenure-track assistant professor at Boston University's medical school. And before that she had held, since receiving her Ph.D. in 1987, postdoctoral fellowships in France and the United States and junior academic positions in France, her place of birth. Over her entire career before coming to Northwestern she had published 22 academic articles. Northwestern hired her in the expectation that she would be doing research on Parkinson's disease as well as teaching students and seeking grants of outside funding for her research.

Several months after arriving at Northwestern she was told that actually she'd been hired as an associate professor rather than as an assistant professor (the former being a higher rank, of course) and that she would be evaluated for tenure after four years, in 2007, rather than after six years, the period typically allowed to new associate professors, or nine years, the period typically allowed to new assistant professors. The period allowed to a faculty member at Northwestern's medical school before the up-or-out decision on tenure tends to be

inverse to rank and (what is usually related) previous experience. The medical school's stated policy is that "the probationary period . . . may be abbreviated in consideration of previous service at another institution" because the longer the candidate for tenure has been a full-time academic the greater the opportunity she's had to prove herself a worthy candidate. Given Blasdel's eight-year stint as an assistant professor at Boston University, the four-year "tenure clock" given her meant she would have been an academic for 12 years when it came time for the tenure decision.

She did not, when hired or for that matter subsequently, ask for more than four years, although this may have been because the chairman of the department, James Surmeier, had told her at the outset that she'd do well at Northwestern and be awarded tenure. (He had been her big booster—the principal advocate of her initial appointment.) Two male faculty hired in the medical school while Blasdel was there were given shorter tenure clocks than she.

She knew she was expected to obtain outside funding for her research (she received an initial inside grant of $500,000 to set up a laboratory—she was offered $600,000 but requested that $100,000 be transferred to her husband, also a scientist, also hired to work at Northwestern's medical school). She brought some outside funding with her to Northwestern but it was used up within months and was not renewed. During her remaining time there she obtained only one other grant, of $900,000 spread over four years for research on drug

addiction. (Parkinson's and drug addiction may seem unrelated, but Blasdel's research specialty—the effects of dopamine on neurons, particularly in the subthalamic nucleus of the brain—relates to both.) That grant was not renewed either, apparently because she did little if any research on drug addiction, and published no papers on the subject, while at Northwestern.

Contrary to Surmeier's advice that she focus on drug addiction, she persisted with her Parkinson's research and in 2006 published her only academic paper since joining the Northwestern faculty, which reported on the results of that research and was published in the *Proceedings of the National Academy of Sciences of the United States of America* (*PNAS*), a top-ranked scientific journal.

Eventually she asked an associate dean of the medical school whether she could request more time before she was considered for tenure, because she had realized belatedly that she had to reorient her research from Parkinson's to drug addiction. He said she could ask for an extension, though she didn't. Surmeier yelled at her when he learned she'd gone over his head to inquire about an extension grounded on her needing to reorient her research, when he had already told her to do that and she'd refused. And he had already asked the associate dean to extend Blasdell's tenure clock, in a letter stating that "much of [her] promise has not been realized, largely because of the demands associated with raising two young boys." It is a strange letter, but for reasons unrelated to her being a woman. In it he asks that she be promoted to associate professor—he seems to

have forgotten that she already *was* an associate professor even though the department originally had planned to hire her as an assistant professor. He received a rather tart response from the associate dean, who reminded him of Blasdel's actual rank and said that family problems were unlikely to justify an extension.

Surmeier's remark concerning Blasdel's failure to realize her full promise because of the kids appears only in the letter about promoting her to associate professor and extending her tenure clock. His letter recommending her for tenure, thus seconding the physiology department's tenure-recommendation letter, makes no reference to family issues (nor does the department's letter). It attributes her failure to realize her full promise—a failure too obvious not to be addressed if the letter was to be credible—to purely work-related problems that were not her fault and had been overcome and therefore should not be regarded as an obstacle to tenure, which he urged that she be given.

The same day that Blasdel had started work at Northwestern, so had Mark Bevan, also a physiologist. He was six years younger than she and had been an assistant professor at another university for only three years; so although appointed an associate professor like Blasdel he was given a six-year tenure clock. At a much-criticized presentation of her work on Parkinson's disease, Bevan called her work "shit" and another member of the department (Charlie Wilson) said she didn't know what she was doing. After that meeting she complained to Surmeier that she wasn't getting enough feedback from

Bevan and Wilson and he told her that he understood her "emotional need to be heard." Apparently she'd fought back hard against Bevan and Wilson at the session in which she had presented her views—Surmeier described her to them somewhat apologetically as "combative" but asked them to give her another chance to present her views. She did, but failed to overcome their criticisms.

As Blasdel's four-year probationary period neared its end, she realized that she hadn't published enough, and obtained enough external funding, to be awarded tenure. She needed an extension of time and Surmeier told her she might be able to obtain it because in his view Northwestern should accommodate the needs of "a woman scientist who reproduced." The strange formula is treated by Blasdel's lawyer (she repeats it incessantly in her briefs) as sexist. But in context it is apparent that all that Surmeier meant is that a woman scientist who has young children, as Blasdel did, should be given more time to prove herself as a scientist than a man unless her husband stays home with the kids (and Blasdel's husband, also employed by Northwestern as a scientist, did not) or she is independently wealthy (and the Blasdels are not); for otherwise she will have to shoulder a heavy burden of child care.

For whatever reason, Blasdel was not performing to expectations, as she acknowledged, and Surmeier was offering the associate dean an explanation that might persuade him to give her more time to prove herself. He explained that she was the "primary caregiver to two

young boys" who had had "difficulty transitioning [from Boston] to public school in Chicago." He must have gotten this information from her, and she doesn't suggest that it's inaccurate. She comes close to arguing that such remarks, when made by a superior, are "illegal"—but when made to *extenuate* a woman scientist's failing to realize her full promise could be complained of only by a man denied similar consideration.

Surmeier's choice of words to denote the class of women for whom family responsibilities can impede professional advancement was as we said strange—but scientists often talk strangely, geekily, as they have chosen a profession most branches of which are concerned with things (neurons, quarks, computer code, etc.) rather than with people. A scientist might say that a donkey is an ungulate that reproduces and a mule is an ungulate that doesn't reproduce, whereas a layperson would just say mules are sterile. And similarly a layperson would say that allowances should be made for women scientists who have young children, while a scientist might separate women into reproducers and nonreproducers—and men as well.

We mustn't forget that Surmeier requested that Blasdel be hired in the first place, and did so with great enthusiasm. Granted, we have rejected "the so-called 'common actor' [sometimes referred to as the 'same actor'] presumption. When the same person hires and later fires the employee who claims that his firing was discriminatory, judges are skeptical, because why would someone who disliked whites, or Germans, or members of some other

group to be working for him have hired such a person in the first place? It is misleading to suggest that this skepticism creates a 'presumption' of nondiscrimination, as that would imply that the employee must meet it or lose his case. It is just something for the trier of fact to consider." *Hernreiter v. Chicago Housing Authority*, 315 F.3d 742, 747 (7th Cir. 2001); see also *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 496 n. 6 (3d Cir. 1995). In this case it is something that undermines any inference that Surmeier harbors prejudice against female scientists. See *Harris v. Warrick County Sheriff's Department*, 666 F.3d 444, 449 (7th Cir. 2012); cf. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 724-25 (7th Cir. 2008).

Blasdel decided not to request that the hands on her tenure clock be pushed back a year; instead she submitted her tenure application within the four-year deadline. The physiology department recommended tenure for her in an enthusiastic letter, Surmeier submitted a supportive letter as we know, and Blasdel also received supportive letters from neuroscientists outside of Northwestern.

An ad hoc reviewing committee in the medical school seconded the department's tenure recommendation while expressing concern about Blasdel's "moderate publication record," "uneven" productivity, and problems obtaining external funding. The committee's report was then reviewed by two members (one male, one female) of the medical school's appointments, promotion, and tenure committee. They both recommended against tenure for Blasdel, because of her low publication rate, substantial

gaps in her publication record, relatively tepid recommendations from outside referees, and inability to obtain adequate external funds and renew the grants she did obtain. As Mark Bevan noted in his deposition, success in obtaining renewals of research grants is a vital consideration in tenure applications in scientific departments. Because of their expensive facilities and equipment, without research grants these departments wither. See, e.g., *Sun v. Board of Trustees of University of Illinois*, *supra*, 473 F.3d at 807; *Whaley v. City University of New York*, 555 F. Supp. 2d 381, 406-07 (S.D.N.Y. 2008); *Sundaram v. Brookhaven Nat'l Laboratories*, 424 F. Supp. 2d 545, 574 (E.D.N.Y. 2006); see also Harvard Medical School, "Criteria for Appointment and Promotion," http://facultypromotions.hms.harvard.edu/index.php?page=AE_investigation; Johns Hopkins Medicine, "Faculty Policies: Appointments and Promotions of Full-Time Faculty," § II.C, www.hopkinsmedicine.org/som/faculty/policies/goldbook/promotions.html; University of Pennsylvania Perelman School of Medicine, "Guidelines for Conversations with Tenure-track Faculty," www.med.upenn.edu/mentee/bs1-3.shtml; Stanford School of Medicine, "Faculty Handbook," § 2.4.I.1, p. 43 www.med.stanford.edu/academicaffairs/handbook/documents/Chapter2.pdf. (All web sites were visited on June 29, 2012.)

Failure to obtain the renewal of a grant is particularly serious. The initial grant is given in the hope that it will fund important research. The grant is likely to be renewed if but only if the hope is fulfilled—in other words only if the grantor believes that the money was well spent.

Nonrenewal may therefore imply criticism of the grantee and make it even harder for him or her to obtain future grants.

As an example of "comments evidencing gender stereotyping and discrimination," Blasdel's lawyer quotes the statement by Robert Lavker, one of the two reviewers of Blasdel's tenure application, that "the demands of a family have been given as one of the mitigating circumstances underlying [Blasdel's] lack of productivity," that he (Lavker) "appreciate[d] the weight that family can exert on one's career and that the woman quite often bears the brunt of many of these burdens," that "many institutions grant an additional year on the tenure clock for each child in a family," and that if this hadn't been done for Blasdel "I strongly suggest that her clock be extended." This doesn't sound like "gender stereotyping and discrimination," but in any event must be placed in the context of Lavker's entire evaluation of the physiology department's recommendation for tenure. We therefore quote it in full:

> I disagree with the ad hoc committee's recommendation of awarding tenure for the following reasons:
>
> 1. Since finishing her post-doctoral fellowship in 1994, Dr. Mintz [Blasdel's maiden name—it appears that she uses her maiden name and her married name interchangeably] has only published 4 papers without her mentor, and more importantly since joining the faculty at Northwestern, she has only published 1 original manuscript. While her publications are in high quality, broad-readership journals, this level of

productivity is far below what is expected of an individual for tenure.

2. Since joining the faculty at Northwestern, she has presented one invited lecture and has only been invited to present three lectures in total. Tenure-worthy candidates usually have many more invited lectures (e.g., Gordon or Keystone Conferences; visiting professorships) and involvement in symposia at national meetings both as an organizer and participant. Such an extremely modest number of invited lectures fail to make a case for "substantial external professional recognition."

3. Dr. Mintz has not held leadership positions in any professional societies nor serves on any editorial boards. Such academic service, indicative of professional recognition is usually [*sic*] and customary for tenure-eligible candidates.

4. Dr. Mintz has only served as an Ad Hoc member once on a Study Section. Tenure-eligible candidates with this much time since finishing post-doctoral training usually serve or have served as permanent members of Study Sections. Again, this focuses on the issue of external professional recognition.

5. Dr. Mintz has only one current NIH grant and does not provide evidence of success in competitive renewals of existing grants. Tenure-eligible candidates usually have two NIH R01 [Research Project Grants] grants, and/or evidence of the ability to successfully renew initial grants.

6. While the external referees uniformly praised Dr. Mintz's scientific contributions and her scientific spirit, several questioned whether she would get tenure at their institutions. In addition, it is disturbing that nine individuals did not write letters and some claimed not to be familiar with her work even though many were in neurology and/or related fields. It is my experience that being a controversial person usually results in the generation of letters not the absence thereof.

7. The demands of a family have been given as one of the mitigating circumstances underlying Dr. Mintz's lack of productivity. I appreciate the weight that family can exert on one's career and that the woman quite often bears the brunt of many of these burdens. Many institutions grant an additional year on the tenure clock for each child in a family. If this has not been done for Dr. Mintz then I strongly suggest that her clock be extended.

8. While I agree with [Surmeier] that Dr. Mintz has "great scientific promise" and "that she will continue to grow scientifically and elevate her level of productivity," in my experience, tenure is not granted for potential but rather for accomplishments. Therefore, taking all of the above into consideration, Dr. Mintz does not meet the requirements for granting tenure.

Unsurprisingly in light of Lavker's evaluation, and the recommendation against tenure by the other reviewer as well (Margarita Dubocovich, who in her report noted among other things that Blasdel's "scholarly productiv[ity]

(publications, abstracts, invited seminars and con-
ferences, national and international recognition) has
been below average, and her teaching and service con-
tributions has been minimal," and "she has yet to demon-
strate that she can renew her research awards"), the
medical school's appointments, promotion, and tenure
committee unanimously recommended against tenure
for Blasdel. The dean of the medical school concurred
in the recommendation, as did the university's pro-
vost—the ultimate decisionmaker.

There is no indication that any member of the medical
school's appointments, promotion, and tenure committee,
or the dean, or the provost discriminates against women
scientists. In the seven years that the dean had been
in office when he recommended against giving Blasdel
tenure, the percentage of tenure track female faculty in
the medical school had increased from 20.5 to 25.4 percent
and their rate of obtaining tenure had exceeded that of
the male faculty. Nor is it suggested that the committee,
or the dean, or the provost rubber stamps tenure recom-
mendations by any department in the medical school—
and of course if they did Blasdel would have gotten
tenure, because her department recommended her for it.
She argues that she was undermined by Surmeier and
others. But her evidence of their being prejudiced
against women is limited to a handful of stray remarks
of ambiguous import at best—such as "a woman
scientist who reproduces," "emotional need to be heard,"
"combative," and Bevan's once calling her "scary!" Bevan's
remark may well have been a compliment—the ad hoc
committee noted that "blunt scientific style could . . . be

viewed as a breath of fresh air in heated scientific discussions," and anyway the comment had nothing to do with the tenure process.

This is not evidence on which a reasonable jury could base a finding of sex discrimination. Compare *Petts v. Rockledge Furniture LLC, supra*, 534 F.3d at 721-24; *Sun v. Board of Trustees of University of Illinois, supra*, 473 F.3d at 813; *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799, 806 n. 7 (7th Cir. 1999); *Morales-Cruz v. University of Puerto Rico*, 676 F.3d 220 (1st Cir. 2012); *Weinstock v. Columbia University*, 224 F.3d 33, 44 (2d Cir. 2000), with *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 845-46, 851, 861-62 (9th Cir. 2002) (en banc), affirmed, 539 U.S. 90 (2003). Blasdel's lawyer disclaims any contention that there was a "conspiracy" among the university faculty and officials involved in the denial of tenure. And this is not a case in which the ultimate decisionmaker, though himself free from prejudice, is manipulated by an unscrupulous underling, as would be the case had Surmeier, actuated by a desire to maintain the physiology department as a male bastion, falsely charged Blasdel with plagiarism and the falsity was not discovered until after she was denied tenure. His fraud would be imputed to his employer, the university. *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1190 n. 1, 1191-94 (2011); *Hicks v. Forest Preserve District*, 677 F.3d 781, 789-90 (7th Cir. 2012); *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628-29 (7th Cir. 2012); *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917-18 (7th Cir. 2007).

As for the reference to "male bastion"—a term injected into the case by Blasdel's lawyer—we note that

although the lawyer repeatedly states that her client was the only woman faculty member in the physiology department, there was another one and she had tenure. And remember that Surmeier had hired Blasdel with great enthusiasm, only to be disappointed by her performance at Northwestern.

Blasdel also asks us to infer sex discrimination from a procedural error in Northwestern's rejection of her internal appeal from her tenure denial. *Long v. Teachers' Retirement System*, 585 F.3d 344, 352-53 (7th Cir. 2009); *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 723 (7th Cir. 2005); *Weinstock v. Columbia University*, *supra*, 224 F.3d at 45. The statement by the chairman of the appeals panel that Blasdel's "appeal does not sufficiently allege grounds of appeal within the stated jurisdiction of the University Faculty Reappointment, Promotion, Tenure, and Dismissal Appeals Panel . . . [and that therefore he would] not be convening an appeal body to adjudicate [her] charges" was indeed mistaken. The faculty hand-book states that a "faculty member denied . . . tenure" may, if he or she believes that the denial was based on con-siderations "not demonstrably related to the faculty member's performance," including discrimination based on sex, "file a written appeal with the University Faculty Reappointment, Promotion, Tenure, and Dismissal Ap-peals Panel," as Blasdel did. But the procedural bobble by the appeals panel's chairman, who was remote from the process that resulted in the denial of tenure for Blasdel (he was a music professor), is insufficient to create a triable issue. See *Qamhiyah v. Iowa State University of Science & Technology*, *supra*, 566 F.3d at 746-47; *Weinstock*

*v. Columbia University*, *supra*, 224 F.3d at 45; *Zahorik v. Cornell University*, *supra*, 729 F.2d at 93-94. Blasdel doesn't allege that the dismissal of her appeal was a Title VII violation. There is no indication that the music professor is prejudiced against women scientists.

She also asks us to infer sex discrimination from the fact that Mark Bevan, who applied for tenure at the same time she did, applied three years before his tenure deadline and only six years into his academic career—and his application was granted. There is no indication that she and Bevan were competing for a single tenure slot and therefore that the grant of tenure to him was necessarily a rejection of tenure for her. It thus is not a case of a male-female face-off won by the male. Nor is the evidence considered as a whole that she was better qualified for tenure than he. He had been the lead author on six articles during his time at Northwestern, compared to Blasdel's one. He had been successful not only at obtaining external funding—six grants to her two (the first being the grant she'd received at Boston University and that had been used up during her first months at Northwestern, and the second the only grant she got while at Northwestern, and it was not renewed)—but also and critically in renewing his grants, which she had failed to do. He had received enthusiastic letters from senior neuroscientists in support of his tenure application (recall Lavker's reservations about Blasdel's external letters of support). And Blasdel herself had described him as a world-class anatomist—at the top of his field—and though a layperson would think an anatomist different from a physiologist, Blasdel described his work

as very similar to hers. Bevan testified in his deposition that their approaches were so similar that it wouldn't have made sense for them to collaborate on research papers—collaboration is more productive when the collaborators have (at least slightly) different approaches.

It is not a ground for suspicion that despite being younger and not having published in as prestigious journals, Bevan was preferred for tenure over her. His frequency of publication while both were at Northwestern (and remember that they were hired at the same time) was higher than hers, and more consistent over time; there was no indication as there was with her of lagging productivity. He was also more active in presenting his research to the scholarly community. And unlike her he was an excellent "grantsman." These are all vital considerations to a university science department.

Blasdel complains finally about the grant of tenure to another man, Lee Miller. Her lawyer says that "Blasdel's publication record was far superior to Miller's." That is an overstatement, like the lawyer's ungrounded assertion that the record contains "palpable evidence of Surmeier's blatant gender bias." Blasdel had published 23 articles to Miller's 20, but his rate of publication was rising while hers was falling. He had garnered greater external recognition, had many more research grants, and was in much greater demand as an external reviewer of other scientists' papers—yet had received his Ph.D., and begun his academic career, three years later than Blasdel had.

On the record compiled in the lengthy discovery conducted in this case, no reasonable jury could infer that Blasdel was denied tenure because she is a woman. Summary judgment was therefore rightly granted in favor of the university.

AFFIRMED.