In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2079

JOSEPH S. ROBERTS,

*Plaintiff-Appellant,*

*v.*

COLUMBIA COLLEGE CHICAGO, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 828 — **Jorge L. Alonso**, *Judge.*

ARGUED JANUARY 12, 2016 — DECIDED MAY 6, 2016

Before BAUER and HAMILTON, *Circuit Judges,* and PETERSON,[*]
*District Judge.*

BAUER, *Circuit Judge.* Defendant-appellee, Columbia College
Chicago ("Columbia"), terminated plaintiff-appellant, Profes-
sor Joseph Roberts ("Roberts"), after it discovered that Roberts
plagiarized several chapters in a textbook that he composed in

[*] Of the United States District Court for the Western District of Wisconsin,
sitting by designation.

2004. Roberts filed suit against Columbia and several Columbia faculty members. In his complaint, Roberts pleaded multiple theories of recovery. All defendants moved for summary judgment, which the district court granted. Roberts appealed the grant of summary judgment in regards to his claims for breach of contract and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* For the following reasons, we affirm the district court's ruling.

## I.  BACKGROUND

### A.  The Textbook

Columbia hired Roberts in 1999 as a tenure-track professor in the Arts, Entertainment and Media Management Department ("AEMM Department"). Roberts achieved tenured status in 2003. His tenure rights were secured by a contract entitled "Columbia College Chicago Statement of Policy on Academic Freedom, Faculty Status, Tenure, and Due Process" (the "Statement of Policy").

In late 2003, Roberts believed there were no good, reasonably priced textbooks on the subject of economics as applied to the arts. So, he began creating a new custom textbook with the help of his AEMM Department colleague Clark Greene and several graduate students in the AEMM Department. This process involved working with a publishing company to compile materials from other textbooks into one new custom textbook. Roberts worked with publisher McGraw-Hill and used materials from three current textbooks: *Issues in Economics Today* by Robert Guell; *Economics is Everywhere* by Daniel Hamermesh; and *Basic Economic Concepts* by Werner Sichel and

Peter Eckstein. The final product, *Economics for Arts Entrepreneurs and Managers*, consisted primarily of the copied material from the three textbooks. Roberts and Clarke Greene also prepared original material, such as the first chapter.

Roberts testified in his deposition that he sent McGraw-Hill photocopies of the three covers of the textbooks, reference sections, and copyright sections. When his textbook was published, however, the cover was titled: *Economics for Arts Entrepreneurs and Managers: with selected material from Issues in Economics Today and Economics is Everywhere*. The cover also lists the following authors in order: Dr. Joseph S. Roberts, Robert C. Guell, and Daniel S. Hamermesh. The textbook does not reference or cite *Basic Economic Concepts* by Sichel and Eckstein. Further, the inside cover page states, "Peer review, class testing, and accuracy are primarily the responsibility of the author(s)."

Roberts intended to use *Economics for Arts Entrepreneurs and Managers* for his 2004 fall semester class. He requested a final proof of the textbook from McGraw-Hill prior to its publication, but never received one. Instead, the first time Roberts saw the completed textbook was when he purchased it at Columbia's bookstore, after his students for the 2004 fall semester had arrived in class with the textbook already purchased. Upon reviewing it, Roberts noticed several errors, such as omitting the reference to *Basic Economic Concepts* by Sichel and Eckstein, as well as the lack of reference pages at the end of each chapter.

Roberts testified that after he identified the errors, he made a phone call to McGraw-Hill to inform the publisher of the problem, but did not send a follow-up letter or email detailing

the issues. He also provided his students with a corrected reference page. He understood at that time that not citing the Sichel and Eckstein textbook was a "serious error" and created a "big problem" for his book. Ultimately, Roberts and several other colleagues decided to never use *Economics for Arts Entrepreneurs and Managers* again due to the errors and its price. Roberts made no further efforts to ensure McGraw-Hill corrected the omission.

Sometime around either December 2005 or January 2006, Roberts approached graduate student Nissan Wasfie ("Wasfie"), and asked for his assistance updating *Economics for Arts Entrepreneurs and Managers*. Roberts intended to correct the original textbook's reference errors in the updated version. Wasfie agreed to help, however, the updated version never came to fruition because a dispute arose over money that Roberts allegedly owed Wasfie. The original publication was never corrected.

Roberts updated his curriculum vitae in 2009 and 2011. Both times he listed *Economics for Arts Entrepreneurs and Managers* under his list of publications.

### B.  Roberts' Age Discrimination Evidence

In 2010, Roberts served on a search committee to name the AEMM Department Chairperson. The committee identified who they believed was the best candidate, but that individual refused the position due to issues regarding the terms of employment. Eliza Nichols, the Dean of the School of Fine and Performing Arts at Columbia ("Nichols"), then called the individual members of the search committee and asked them to approve Philippe Ravanas ("Ravanas") as the new chairper-

son, which each member did. Roberts testified that Ravanas was the committee's "reluctant second choice," and that Roberts wished the committee was able to convene as a whole prior to making the decision.

Contention arose between Roberts and Ravanas sometime after Ravanas was appointed the AEMM Department Chairperson. Ravanas commented that Roberts and other older members of the faculty did not fit the "image" that Ravanas desired to create, as he wanted to portray a "young and hip look for the program." At that time, Roberts was about fifty years old. Ravanas also removed a photograph of Roberts from the online directory because he believed it did not project the look he wanted for the AEMM Department. In addition, two other tenured professors of the AEMM Department submitted sworn testimony that Ravanas was "hostile" towards older members of the faculty.

Ravanas had other disputes with Roberts as well. On February 23, 2011, Ravanas sent Roberts an email asking him to explain why Roberts received a $250 per month cellphone allowance from Columbia when no other professor did, why Roberts submitted a request for $950 to cover a membership fee for an organization when that organization's website listed the fee as $125, and why Roberts identified himself as associated with the Coleman Foundation after the AEMM Department had cut ties with the group. On April 12, 2011, Ravanas sent Roberts another email questioning why Roberts was listed on the Coleman Foundation's website, why the Self Employment in the Arts Conference website listed Roberts as having a PhD in Entrepreneurship when it was actually in Education, and why Roberts' biography on the AEMM Department

website indicated he designed entrepreneurship programs for inner-city neighborhoods when he had not provided this information to the Department before. Roberts responded that he would contact the websites and ask them to correct the information.

### C.  Plagiarism Investigation

At some point in 2004, before Roberts published *Economics for Arts Entrepreneurs and Managers*, Wasfie noticed graduate students in Roberts' office had open textbooks on Roberts' desk and were typing from them. Wasfie became suspicious that Roberts had committed plagiarism, but did not mention this to anyone at that time.

Wasfie developed a brain tumor in the fall of 2010, and went on leave from December 2010 through March 2011 to recover from brain surgery. Wasfie testified that while on leave, he reflected on "life in general," "justice," and "doing what's right." He decided during this time to investigate whether Roberts had plagiarized *Economics for Arts Entrepreneurs and Managers*. He went to the library to research his suspicions, and eventually compared Roberts' textbook with *Basic Economic Concepts* by Sichel and Eckstein.

In mid-March 2011, Wasfie approached Ravanas with the results of his investigation. He informed Ravanas that a significant part of *Economics for Arts Entrepreneurs and Managers* was unattributed. Wasfie also provided Ravanas with a copy of Roberts' textbook and information regarding the unattributed sections from Sichel and Eckstein's *Basic Economic Concepts*.

In his deposition, Roberts testified that he had indicated the reference error to Wasfie years earlier when Roberts sought Wasfie's assistance with updating the textbook. Roberts also testified that he did not think Wasfie harbored any antagonism towards him, and he believed that someone "put [Wasfie] up to" informing the faculty of Roberts' plagiarism. Roberts acknowledged that he had no evidence other than his own speculations as to whether Ravanas, or anyone else, coerced or induced Wasfie to make the plagiarism allegation against him.

After Wasfie informed Ravanas of the plagiarism, Ravanas compared Roberts' *Economics for Arts Entrepreneurs and Managers* with Sichel and Eckstein's *Basic Economic Concepts*. He concluded that eight chapters from Roberts' textbook consisted almost entirely of unattributed excerpts from the Sichel and Eckstein textbook. This amounted to approximately 10,000 unattributed words total. He prepared a written memorandum detailing his findings. Ravanas forwarded the memorandum to Nichols in early April 2011, who then reviewed the memorandum and compared the relevant textbooks. Nichols also concluded that plagiarism had occurred and informed the vice president for academic affairs, the provost, and the general counsel's office about her findings.

During this same time period, Roberts and other faculty members were organizing their complaints against Ravanas' leadership of the AEMM Department. On May 2, 2011, Roberts and several of his colleagues issued a formal complaint against Ravanas. On May 31, 2011, Roberts and the other faculty members met with Louise Love, who was then-Vice President of Academic Affairs ("Love"), regarding the situation. Immedi-

ately afterwards, Roberts met with Nichols for a previously scheduled meeting.

There are two conflicting accounts of how the May 31, 2011, meeting between Nichols and Roberts transpired. According to Roberts, Nichols accused him of committing plagiarism, told him that he had five minutes to resign, and that if he refused to resign the plagiarism would go on his record. Roberts also testified that Nichols did not show him the memorandum from Ravanas, did not give him an opportunity to present his side of the story, and told him to go to his office and think about his family and career. According to Nichols, she asked Roberts to review Ravanas' memorandum and address the charges contained therein, but Roberts did not get through the first line. She testified that Roberts claimed that the title of the book was wrong, and thus he was not the author of the book. She acknowledged giving him the option to resign and told him to think about it, but denied saying that he only had five minutes to decide. She also testified that Roberts was "very confusing" throughout the meeting and "had absolutely no comprehensible excuse for what he did." Both agree that Roberts called Nichols later that day and informed her that he would not resign.

In June 2011, Love was appointed interim provost of Columbia. As provost, she had the authority to terminate tenured faculty members. Shortly after her appointment, she was informed of the plagiarism charge against Roberts. She investigated the matter by comparing Roberts' *Economics for Arts Entrepreneurs and Managers* with Sichel and Eckstein's *Basic Economic Concepts*. After reviewing the two sources, she concluded that there was "substantial plagiarism" in Roberts'

textbook. She also spoke with Nichols about the matter and reviewed the memorandum prepared by Ravanas. Love did not speak with Roberts as part of her investigation because she believed "[t]he evidence spoke for itself." She also testified that it was irrelevant whether the mistake was Roberts' fault or McGraw-Hill's fault, because "[t]he author is responsible for the material."

After her investigation, Love decided to terminate Roberts' employment. She testified that Columbia made no attempt to address his conduct other than by termination because "[t]he nature of his offense didn't allow for that," since "[h]is violation of the standard of academic integrity was quite egregious."

On June 9, 2011, Love sent Roberts a letter terminating his employment with Columbia. The letter stated, "In accordance with Section IX(A)(2) of the [Statement of Policy], your termination is due to academic dishonesty related to plagiarized passages within your book, *Economics for Arts Entrepreneurs and Managers*." It went on to state that "your continued participation in the affairs of [Columbia] is likely to be detrimental to [Columbia's] reputation and will cause academic harm to [Columbia]." The letter concluded that Roberts was "hereby suspended without pay pending an internal review you may wish to seek."

Upon receiving the letter, Roberts sent an email to Love with a list of clarifications. Love did not respond. Following this, Roberts did not seek the internal review procedures referenced in the termination letter. He stated in his deposition that he "didn't see any point in doing that" based on his

previous experience serving as a member of the internal review panel, known as the Elected Representatives of the College ("ERC"). He further testified that "the ERC powers were reduced, so it was no longer an oversight as intended to be."

On February 6, 2012, Roberts filed a civil lawsuit against Columbia, Nichols, and Ravanas. He made several claims against Columbia, such as breach of contract, retaliatory discharge, defamation, and discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq.*; 42 U.S.C. § 1981; the ADEA; and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* He also brought other claims against all of the defendants, and against Ravanas individually. All defendants filed motions for summary judgment in regards to all counts, which the district court granted on April 21, 2015. Roberts appealed the district court's ruling as to whether summary judgment was appropriate in favor of Columbia for Roberts' breach of contract claim and his ADEA discrimination claim.[1] So, Columbia is the only appellee in this matter.

---

[1] Roberts also alleged that the district court improperly resolved disputed issues of material fact in favor of Columbia, improperly rejected testimony in favor of Roberts as "self-serving," and improperly construed facts, made credibility determinations, and drew inferences in favor of Columbia. Since we review grants of motions for summary judgment *de novo*, whether the district court erred in this regard is not determinative of whether this court should reverse and remand. Under *de novo* review, Roberts can rely upon his brief to argue anew how the relevant facts and reasonable inferences drawn from them, when viewed in the light most favorable to him, show that Columbia was not entitled to judgment as a matter of law or that a genuine dispute of material fact exists.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo*, while construing all facts and drawing all reasonable inferences within the record in favor of Roberts. *Harris v. Warrick Cty. Sheriff's Dep't*, 666 F.3d 444, 447 (7th Cir. 2012) (citation omitted). Summary judgment is appropriate if the moving party shows that no genuine dispute of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In its brief, Columbia argues that this court cannot hear Roberts' claims because the Statement of Policy precludes judicial review by limiting Roberts' relief to the college's internal ERC review process. So, before we can address the merits of Roberts' appeal, we must determine whether the claims were properly brought before the court.

### A. Statement of Policy's Preclusion of Judicial Review

Columbia argues that the Statement of Policy provides that the ERC process was Roberts' sole recourse for reviewing the merits of Columbia's decision to terminate his employment. In support, it cites the following provision from the Statement of Policy:

> A faculty member who wishes to challenge or seek review of the Provost/Senior Vice President's decision to sanction or dismiss him or her may do so solely in accordance with the following provisions of this Section IX.D.2.b., allowing for a review by the [ERC].

Columbia relies on the word "solely," as well as the extensive ERC review procedures set forth within Section IX.D.2.b. of the Statement of Policy, to argue that the contract prevented judicial review of the merits of Love's decision to terminate Roberts' employment.

Initially, we note that Columbia never presented this argument to the district court. Rather, Columbia argued that Roberts had to seek ERC review as a prerequisite for obtaining judicial review. Thus, it made an exhaustion of remedies argument, not the argument that the Statement of Policy summarily prevented Roberts from bringing his claim to the court. As a result, Columbia has waived any argument that the Statement of Policy precludes judicial review. *See Domka v. Portage Cty., Wis.*, 523 F.3d 776, 783 (7th Cir. 2008).[2]

Further, even if the argument were preserved, we find that the Statement of Policy does not prevent judicial review of Roberts' claims. Neither party provided any binding authority regarding whether a private university could preclude judicial review of the merits of a decision to dismiss a tenured professor. While we generally avoid reviewing the merits of deci-

---

[2] At oral argument, Columbia claimed that seeking ERC review was a prerequisite for seeking judicial review of whether the termination *procedures* were properly followed, but that a court could never review the *substantive merits* of the decision to terminate a tenured professor. Since Columbia never argued this in its brief, it is waived and we need not address it. *See Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427, 432 (7th Cir. 1998) (citation omitted) (although party presented argument before district court and at oral argument, the argument was not in the appellate brief, and "arguments not raised in a brief are waived").

sions to grant tenure, *see, e.g.*, *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 816 (7th Cir. 2012), it is unclear whether private universities can contractually prevent the court from reviewing the substantive merits of a university's decision to dismiss a tenured faculty member.

In examining this issue, we find that *McConnell v. Howard University*, 818 F.2d 58 (D.C. Cir. 1987), provides persuasive authority. In *McConnell*, a tenured professor sued Howard University for breach of contract after his employment was terminated. *Id.* at 59. The district court applied a deferential standard of review because the faculty handbook stated that in reviewing faculty grievances, "[t]he decision of the Board of Trustees shall be final." *Id.* at 67. The District of Columbia Circuit reversed, finding the contract did not limit judicial review of university decisions to terminate tenured faculty members. *Id.* at 67–68. "Such a reading of the contract renders tenure a virtual nullity. Faculty members like Dr. McConnell would have no real *substantive* right to continued employment, but only certain *procedural* rights that must be followed before their appointment may be terminated." *Id.* at 67 (emphasis in original). Although the contract language stated that the Board of Trustees' decision was final, the court found that this only clarified that there were no "further avenues of review *within the University*." *Id.* at 68 (emphasis in original). The court reasoned, "If we were to adopt a view limiting judicial review over the substance of the Board of Trustees' decision, we would be allowing one of the parties to the contract to determine whether the contract had been breached. This would make a sham of the parties' contractual tenure arrangement." *Id.*

This case parallels *McConnell*. The Statement of Policy's language states that terminated tenured professors wishing to seek review of the decision "may do so solely in accordance with the following provisions of this Section IX.D.2.b., allowing for a review by the [ERC]." This does not mandate ERC review as the sole recourse available, and that terminated tenured professors cannot seek judicial review. Rather, it states that terminated professors who "wish" to challenge the provost's decision "may do so solely in accordance with" the procedures specified within the contract. As in *McConnell*, the provision here merely clarifies the internal review procedures for professors seeking to challenge the termination decision *within Columbia itself*. It does not prevent terminated tenured professors from bringing their claims to court. Further, tenure would be an illusory benefit if we interpreted the Statement of Policy as preventing Roberts from filing suit to challenge the merits of Columbia's decision to terminate his employment.

Therefore, since Columbia waived its argument that the Statement of Policy precluded judicial review, and the Statement of Policy does not prevent judicial review, we find that Roberts properly brought his breach of contract complaint before the court. So, we turn to the merits of his claim.

## B. Breach of Contract

Both parties agree that Illinois law governs Roberts' breach of contract claim. Under Illinois law, to sustain a breach of contract claim a plaintiff must prove: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351

Ill. App. 3d 752, 286 Ill. Dec. 734, 814 N.E.2d 960, 967 (2004). In this case, Roberts' tenure rights were secured by the Statement of Policy, which both parties agree constitutes a contract between Roberts and Columbia.

Roberts argues that Columbia breached two separate provisions of the Statement of Policy. He first claims that Love did not conduct an "appropriate" investigation into the plagiarism charge. He also argues that Columbia breached the contract by not imposing less severe sanctions to remedy his conduct. We address each issue separately.

### 1. Whether Love Conducted an Appropriate Investigation

The pertinent language from the Statement of Policy regarding Roberts' first claim is as follows: "the Provost/Senior Vice President will undertake such investigation and comply with such procedures as he or she believes appropriate."

Roberts acknowledges that the Statement of Policy granted Love discretion in determining how to investigate the plagiarism charge. But he argues that she still had to exercise her discretion in good faith. Roberts alleges that Love did not exercise her discretion in good faith because plagiarism contains an intent element, yet Love never attempted to discern whether Roberts intentionally plagiarized. Instead, her investigation consisted of comparing the relevant chapters from Roberts' *Economics for Arts Entrepreneurs and Managers* with the corresponding text from Sichel and Eckstein's *Basic Economic Concepts*, consulting with Nichols (who had previously met with Roberts regarding the matter), and reviewing the memorandum prepared by Ravanas.

We disagree that as a matter of law plagiarism necessarily contains an intent element. In *Seitz-Partridge v. Loyola University Chicago*, the Illinois appellate court examined an almost identical issue in a case involving a graduate student who was accused of plagiarism. 2013 Ill. App. (1st) 113409, 369 Ill. Dec. 692, 987 N.E.2d 34, 42 (2013). The graduate student argued that she did not commit plagiarism because any plagiarism that occurred was unintentional. *Id.* In its analysis, the court examined the student handbook and found that it did not contain an intent element for its definition of plagiarism. *Id.* The court also examined the two university committees' investigations against her, and found that neither made a finding that the plaintiff intentionally plagiarized. *Id.* As a result, the student could not create a genuine dispute of material fact by arguing that she did not intend to plagiarize. *Id.* at 42–43. In this case, Roberts similarly cannot point to anything in the Statement of Policy defining plagiarism, nor did Provost Love make a finding that he acted intentionally. Thus, whether he intentionally plagiarized is irrelevant.

Roberts also argues that Love's investigation was not undertaken in good faith because she did not examine whether he took efforts to remedy his plagiarism. Specifically, he claims that he called McGuire-Hill to report the problem, did not use the textbook for future classes, and distributed corrected reference pages to his students. We note, however, that he failed to remove the plagiarized textbook from his curriculum vitae for several years. Regardless, the fact that Roberts took some efforts to remedy his plagiarism is not relevant in this matter. The question before us is not whether Love's investigation was maximally thorough; it is only whether she

acted in good faith when she exercised her discretion under the Statement of Policy to determine an "appropriate" investigation into whether Roberts plagiarized. Love had a documented case of serious plagiarism. She made a reasonable decision that she had the evidence she needed, and Roberts has not adduced evidence to show her bad faith. We conclude that Columbia did not breach the Statement of Policy.

### 2. Whether Lesser Sanctions Were Required

Roberts also claims that Columbia breached the Statement of Policy by not imposing less severe sanctions against him to remedy his conduct. The pertinent language reads:

> The College is authorized … to dismiss a faculty member with a Tenured Appointment for Cause. Prior to dismissing such a faculty member, the College will, in *ordinary circumstances*, attempt to correct the conduct giving rise to Cause by other less severe action. Dismissal is appropriate if such action has failed to end such conduct within a specified period of time or other less severe action is inappropriate and contrary to the best interests of the College because of the *nature or seriousness of the conduct*. (Emphasis added.)

Plagiarism is not an "ordinary circumstance" in the academic community. As Columbia cited in its brief, "[p]lagiarism is considered by most writers, teachers, journalists, scholars, and even members of the general public to be the capital intellectual crime." Richard A. Posner, The Little Book of Plagiarism 107 (2007). Roberts himself admitted that "[i]n

academia, plagiarism is considered an egregious and serious offense."

Roberts argues that, based on the broad Statement of Policy language, it is necessarily a jury question whether his conduct constituted "ordinary circumstances" in which less severe action was required.[3] We acknowledge that it may be difficult in some instances to distinguish between an "ordinary circumstance" and a case in which the "nature or seriousness of the conduct" justifies termination. It is clear, though, that in the academic realm few charges are more serious than plagiarism. Therefore, it was perfectly reasonable for Love to find that the "nature or seriousness" of Roberts' plagiarism within *Economics for Arts Entrepreneurs and Managers* was such that it was improper to attempt to correct his conduct through less severe action. *See Korf v. Ball State Univ.*, 726 F.2d 1222, 1228 (7th Cir. 1984) (finding that the university reasonably interpreted the faculty ethics provision prohibiting "exploitation of students for … private advantage" to include the professor's sexual exploitation of his students). As a result, her decision to terminate Roberts' employment, rather than impose less severe sanctions, did not breach the Statement of Policy.

---

[3] Roberts relies on a district court case, *Lerman v. Turner*, 2013 WL 4495245 (N.D. Ill. 2013), to support this argument. *Lerman* is an unpublished district court opinion that has no binding precedential authority over this court. *Wirtz v. City of South Bend*, 669 F.3d 860, 863 (7th Cir. 2012) (citations omitted) ("A district court decision does not have precedential effect … that is, it is not an authority, having force independent of its reasoning, and to which therefore a court with a similar case must defer even if it disagrees, unless the circumstances that justify overruling a precedent are present.").

### C. ADEA Claim

Roberts also claims that Columbia's termination of his employment constituted unlawful discrimination on account of his age. "The ADEA makes it unlawful for an employer to refuse to hire or otherwise discriminate against an individual 'because of such individual's age.'" *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014) (citing 29 U.S.C. § 623(a)(1)). ADEA protection extends to individuals who are 40 years of age or older. 29 U.S.C. § 631(a). A plaintiff asserting an ADEA claim may proceed under the direct or indirect method of proof. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012). In this case, Roberts has proceeded under the direct method of proof, which requires him to either present a direct admission from Columbia that he was fired for age discriminatory reasons, or show a "convincing mosaic" of circumstantial evidence that "points directly to a discriminatory reason for [Columbia's] action." *Id.* (citations omitted). Further, Roberts must "show evidence that could support a jury verdict that age was a but-for cause of the employment action." *Id.* at 604 (citations omitted).

In this case, Love made the decision to terminate Roberts. Roberts has not produced any evidence indicating that she had any animus against him on account of his age. Instead, Roberts argues that under a "cat's paw" theory of liability, Ravanas' hostility against Roberts on account of his age could be imputed to Love due to Ravanas' involvement in the termination process.

"In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an employee is fired or

subjected to some other adverse employment action by a
supervisor who himself has no discriminatory motive, but
who has been manipulated by a subordinate who does have
such a motive and intended to bring about the adverse
employment action." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628
(7th Cir. 2012). To prevail on his cat's paw theory, Roberts has
to show that Love's decision was "decisively influenced by
someone who *was* prejudiced." *Blasdel*, 687 F.3d at 817 (empha-
sis in original) (citations omitted). Even if we assume that
Ravanas' comments to Roberts and the affidavits from Roberts'
colleagues were sufficient to show that Ravanas was preju-
diced against Roberts on account of his age, there is no
evidence that Ravanas "manipulated" or "decisively influ-
enced" Love's decision to terminate Roberts' employment.

In *Woods v. City of Berwyn*, we found that the Supreme
Court's holding in *Staub v. Proctor Hospital* changed cat's paw
liability in this circuit such that we no longer require the
subordinate with the discriminatory animus to be the "singular
influence" on the decision-maker. 803 F.3d 865, 869 (7th Cir.
2015). But we noted that the Supreme Court still left open the
possibility for cases in which a subordinate's discriminatory
animus is too remote to the decision-maker to sustain a cat's
paw theory of liability. *Id.* at 870. Specifically, in instances
where the final decision-maker conducted his or her own
investigation into the matter, we stated:

> If the ultimate decision-maker does determine
> whether the adverse action is entirely justified
> apart from the [subordinate's] recommendation,
> then the subordinate's purported bias might not
> subject the employer to liability. This is consis-

tent with our previous holdings that "the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier–Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011). To hold otherwise would be to rule that whenever a discriminatory subordinate makes an allegation or institutes a charge and the plaintiff-employee is fired, there are no steps the ultimate decision-maker could ever take to break that chain of proximate causation. That cannot be so.

*Id.*

In this case, Love conducted her own investigation into whether to terminate Roberts' employment. She read Roberts' *Economics for Arts Entrepreneurs and Managers* and compared the controversial chapters with the specific un-credited sections from Sichel and Eckstein's *Basic Economic Concepts*. By examining the primary sources, she determined for herself that Roberts had committed plagiarism. In addition, Love consulted with Nichols after Nichols had previously met with Roberts regarding the situation. Although Love also reviewed Ravanas' memorandum, it is clear that she conducted a "meaningful and independent investigation" into the matter apart from relying on Ravanas' recommendations. Further, Roberts does not contest the accuracy of Ravanas' memorandum, and in fact admitted the accuracy of substantially all of the allegations contained therein. Also, there is no evidence that any other tenured professor, of any age, had engaged in similar plagia-

rism and had not been fired. Thus, there is no reasonable inference that Ravanas' age hostility against Roberts manipulated Love's decision to terminate Roberts' employment.

Roberts attempts to save his cat's paw theory by arguing that Ravanas' memorandum "set in motion the eventual termination." That is incorrect; Wasfie originated the plagiarism charge against Roberts, not Ravanas. Further, once Wasfie accused Roberts of plagiarism, Ravanas undertook his own independent investigation into the matter, rather than blindly rely on Wasfie's accusations. As discussed above, Roberts does not contest the accuracy of Ravanas' memorandum's findings and has not presented any evidence that Ravanas only investigated the plagiarism charge because of Roberts' age. Therefore, his ADEA claims cannot withstand summary judgment.

### III.  CONCLUSION

The judgment of the district court is AFFIRMED.